UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JEREMY RICHARDSON and
MANDY LARSON, on behalf of
themselves and all others
similarly situated,

        Plaintiffs,

v.                    Case No. 2:18-cv-715-Ftm-99MRM

PROGRESSIVE AMERICAN
INSURANCE COMPANY,
PROGRESSIVE SELECT
INSURANCE COMPANY, J.D.
POWER & ASSOCIATES, AND
MITCHELL INTERNATIONAL
INC.

        Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on two motions: (1) Plaintiffs' Motion for Class Certification (Doc. #82-24), and (2) defendants Mitchell International, Inc. and J.D. Power & Associates' Motion To Exclude Hubele Affidavit from Consideration in Connection With Plaintiffs' Motion for Class Certification (Doc. #89). The parties have filed Responses, Replies, and Notices of Supplemental Authority. (Docs. ## 87, 89, 90, 98, 99, 103, 104, 106, 107, 115, 116.) The Court heard oral argument on December 18, 2020. With the permission of the Court, the parties thereafter filed a Joint Submission Regarding "Market Value Subclass." (Doc. #119.)

The named-plaintiffs each obtained an insurance policy from a Progressive insurance company covering their respective vehicle. Each vehicle was involved in an accident, and was declared a total loss by Progressive.  Each plaintiff accepted a settlement amount from the Progressive insurer for the respective vehicle.  After being approached by the law firm of Morgan & Morgan, plaintiffs sued two Progressive companies and two other defendants, asserting that the settlement amounts they accepted were less than they were due under their insurance policies and Florida law.  Plaintiffs seek to proceed as a class action, and to certify a Florida class with two sub-classes.

For the reasons set forth below, the motion to certify is denied.  In sum, the Court finds: that plaintiffs' proposed class and subclasses are overbroad, but a modified class is adequately defined and ascertainable; both plaintiffs have sufficiently shown their standing to represent the modified class and subclasses; plaintiffs have satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Fed. R. Civ. P. 23(a); plaintiffs have not satisfied any of the requirements of Rule 23(b)(2) or Rule 23(b)(3) or the requirements of Rule 23(c). The Court, in the exercise of its discretion, denies certification of the proposed or modified class. The motion to exclude the affidavit is denied.

## I.   Factual Background

The Court takes the following relevant background facts from the Class Action Complaint (Doc. #26) and evidence submitted by the parties:[1]

### A. NADA Guidebook

Prior to mid-2011, Progressive American Insurance Company and Progressive Select Insurance Company (collectively Progressive) used the National Automobile Dealers Association (NADA) Guidebook to adjust first-party vehicle total loss claims in Florida. (Doc. #87-13, pp. 9-10.)[2]  The NADA Guidebook provides "retail values" and "trade-in values," both of which are based upon actual transactions derived from "dealer management systems" and recorded in J.D. Power's "Power Information Network" (PIN).  (Doc. #110-2, ¶¶ 13, 18.)  The retail value is intended to represent what a buyer would pay for a vehicle from a dealer.  (Id., ¶ 15.)  The trade-in value is intended to represent the price of a vehicle when it

---

[1] "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011) (citations and quotations omitted).

[2] The page numbers of the filed documents do not always correspond with the page number placed on the top of the document by the Clerk's Office computer at the time of filing.  If there is a conflict between page numbers, the number designated in the Opinion and Order will be the number placed on the document by the Clerk's Office at the time of filing.

is purchased by a dealer from a consumer.  (Id., ¶ 14.) The NADA retail vehicle valuations are based upon retail transaction datasets from actual sales between dealers and consumers, while the trade-in values are based on wholesale transaction data, including data from auctions.  (Id., ¶ 19.)  The NADA Guidebook includes national valuation information, as well as regional valuation information for ten different regions in the United States.  The State of Florida is in the "Southeastern" region, which includes Mississippi, Alabama, Georgia, South Carolina, North Carolina, and Tennessee.  (Id., ¶¶ 7, 12.)  Apart from considering mileage, the NADA retail prices do not consider the condition of a vehicle at all; each vehicle is considered to be in "clean" condition, with a marketable title.  (Id., ¶¶ 24-27.)

**B. WCTL System**

In mid-2011 Progressive entered into a contract with defendant Mitchell International, Inc. (Mitchell International) to utilize a proprietary product called the "Work Center Total Loss" system (the WCTL system) to assist Progressive in the valuation of total loss vehicles.[3]  Since then Progressive has used the WCTL

---

[3] According to the WCTL Vehicle Valuation Reports given to plaintiffs, the

> Work Center Total Loss was built through a joint-partnership between J.D. Power and Associates vehicle valuation division Power Information Network (P.I.N.) and Mitchell International, a leading provider of claims processing solutions to private passenger insurers.

system to determine the value of all Florida total loss vehicles covered by its policies. (Doc. #56, ¶¶ 6, 65; Doc. #87-1, pp. 8-9; Doc. #87-10, pp. 19-20; Doc. #87-13, p. 9.)  The WCTL system provides total loss valuations to Progressive's adjustors, referred to as managed repair representatives (MRRs), through a computer interface that automatically generates a report based upon comparable vehicle data. (Doc. #56, ¶¶ 6, 37; Doc. #58, ¶ 37; Doc. #59, ¶ 37; Doc. #106-1, p. 3.)

The WCTL system involves a five step process in the valuation of a vehicle: Step 1—Locate Comparable Vehicles; Step 2—Adjust Comparable Vehicles; Step 3—Calculate Base Vehicle Value; Step 4—Calculate Loss Vehicle Adjustments; and Step 5—Calculate the Market Value. (Doc. #87-18, pp. 10, 19.) The WCTL methodology has stayed fundamentally the same since 2012. (Doc. #87-8, p. 6; Doc. #110-3, p. 4; Doc. #87-1, p. 4.)

The WCTL system identifies vehicles comparable to the total loss vehicle by searching vehicles for sale in the local market (i.e., where the total loss vehicle is located) by dealers and on vehicle sales websites. (Doc. #87-19, p. 17.)  The comparable vehicles are then adjusted by adding or subtracting value based on differences in vehicle mileage or equipment in order to make the

---

(Docs. ##26-2, 26-3.)   Mitchell International asserts that the reference to "joint-partnership" is a characterization of the working relationship, not of a legal relationship. (Doc. #99, p. 6, n.1.)

comparable vehicle more like the total loss vehicle.  (Doc. #87-18, pp. 10, 19; Doc. #87-19, p. 17.)  Once the comparable vehicles are identified and adjusted, a "base value" for the total loss vehicle is calculated by averaging the values of the comparable vehicles identified in the WCTL system.  (Doc. #87-18, pp. 10, 19; Doc. #110-3, p. 4.)

The "base value" is then adjusted in the WCTL system for the condition of the total loss vehicle, which is initially presumed to be in "typical" condition (a 3.0 rating).  (Doc. #87-7, pp. 10-11.)  If the total loss vehicle's condition is deemed to be in less than typical condition, there is a resulting decrease in the base value.[4]  (Id.; Doc. #87-1, pp. 18-19.)  On the other hand, if the total loss vehicle's condition is better than average, the base value is adjusted upwards. (Id.)

Once the base value is adjusted, the WCTL system calculates the market value of the vehicle.  (Doc. #110-3, p. 5.)  The market

---

[4] The condition adjustments are based solely on Manheim data that is provided to defendant Mitchell International. (Doc. #87-7, pp. 8-9; Doc. #87-8, p. 9.)  Manheim provides Mitchell International with quarterly reports based upon 68 "wholesale" auto auctions that are used for the WCTL "condition adjustments." (Doc. #87-23, p. 3.)  Manheim identifies the make, model, year, and sale month of each vehicle, along with a single numerical grade from 0 to 5 (zero being worst to five being best), for each auctioned vehicle. (Id., pp. 13, 22-23.)  The Manheim data does not account for condition ratings (numerical ratings) for components or subcomponents of the auctioned vehicles.  (Id., pp. 31-32.)  The Manheim wholesale auction data does not provide any "retail" pricing information for its vehicles. (Id.)

value is the "base value" modified by condition, prior damage, aftermarket parts, refurbishment, and title history (Doc. #87-1, p. 11), and thus reflects the value of the vehicle prior to the accident, not the amount an insured would need to purchase a comparable replacement vehicle. (Doc. #87-7, pp. 13-14; Doc. #87-10, pp. 3-4.)

Progressive's MRRs input vehicle information for the total loss vehicle into the WCTL system, such as mileage, the vehicle identification number, the make and model, optional equipment, and the condition of the vehicle. (Doc. #87-11, pp. 8, 9.) The MRRs also inspect the total loss vehicles and assign numerical grades, on a scale of 1 to 5 (1 being worst possible condition, and 5 being excellent condition), for each vehicle's pre-loss condition, evaluating thirteen different components including the exterior, interior, tires, and engine. (Doc. #98-5, pp. 6-8.) The WCTL system prepares a report explaining the valuation in detail, which is provided to the insured.

### C. The Progressive Insurance Policies

Plaintiff Jeremy Richardson (Richardson) obtained an insurance policy providing coverage for his 2009 GMC Yukon sports utility vehicle from Progressive Select Insurance Company. (Doc. #29-1.) Plaintiff Mandy Larson (Larson) obtained an insurance policy for her 2003 Toyota Tundra Limited truck from Progressive American Insurance Company. (Doc. #29-2.) Richardson and Larson

are referred to collectively as "Plaintiffs." The relevant material provisions of their two insurance policies, collectively referred to as the "Policies," are identical.[5]

In "Part IV- Damage To A Vehicle," the Policies provide that Progressive will "pay for sudden, direct, and accidental loss" to a "covered auto." (Doc. #29-1, pp. 28-29.) The Policies' limit of liability for such a loss is the lowest of:

> a. the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
>
> b. the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
>
> c. the amount necessary to repair the damaged property to its pre-loss physical condition reduced by the applicable deductible; or
>
> d. the Stated Amount shown on the declarations page for that covered auto; . . .

(Id., p. 33.)[6] "The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs." (Id., p. 34.) At Progressive's option, it may "pay for the loss in money" or "repair or replace the damaged or stolen

---

[5] While the Court cites to the Richardson Policy (Doc. #29-1) in this section, the Larson Policy (Doc. #29-2) has identical provisions for coverage and limits of liability for automobile coverage unless otherwise specified.

[6] Progressive's policy language for first-party property damage claims relating to limits of liability has been the same since 2012. (Doc. #87-10, p. 9.)

property."   (Id., p. 35.)   The Policies further provide that in settling claims Progressive

> may use estimating, appraisal, or injury
> evaluation systems to assist us in adjusting
> claims under this policy and to assist us in
> determining the amount of damages, expenses,
> or loss payable under this policy.  Such
> systems may be developed by us or a third party
> and may include computer software, databases,
> and specialized technology.

(Id., p. 39.)

The terms of the Policies are conformed to Florida statutes by a provision which states in part: "If any provision of this policy fails to conform to the statutes of the state listed on your application as your residence, the provision shall be deemed amended to conform to such statutes."   (Id., p. 40.)   If the parties cannot agree on the amount of loss, the Policies permit either party to demand an appraisal of the loss to resolve any dispute as to the value of the loss. (Id., p. 36-37.)

**D. Plaintiffs' Vehicle Accidents and Claims**

On January 3, 2017, Richardson's 2009 GMC Yukon was involved in an accident.  Richardson retained counsel to represent him in the claim processing with Progressive.  Progressive determined that Richardson's vehicle was a total loss.  (Doc. #87-10, pp. 19-20; Doc. #87-18, p. 11.)  Progressive used the WCTL system to search for vehicles within a 150-mile radius from the Yukon's location, and located four comparable vehicles.  (Doc. #87-18, p. 14.)  The WCTL system made negative price adjustments on all four

comparable vehicles and averaged the prices of comparable vehicles, to reach a base price of $17,257.06. Richardson's vehicle was given a rating of "2.60-Good," and received a negative condition adjustment of $1,455.88 and a positive condition adjustment of $130.00. (Id.) The WCTL system determined the market value of Richardson's vehicle was $15,931.18, and after subtracting his deductible, Progressive sent a settlement payment of $15,681.18 to Richardson's lender. (Id., p. 11.) Richardson still owed $6,894.53 on his auto loan, but did not have to pay anything more because he had obtained guaranteed asset protection (GAP) insurance. (Doc. #98-3, pp. 81-82; Doc. #98-8; Doc. #98-9.) Neither Richardson nor his attorney contested the settlement amount.

On October 6, 2017, Larson's 2003 Toyota Tundra was involved in an accident. Progressive determined that Larson's vehicle was a total loss. Four comparable vehicles were located within a 75 miles radius of Larson's Toyota, and the sold and/or list prices were negatively adjusted to reach a base value of $8,290.49. (Id., p. 4.) Larson's vehicle received an overall condition rating of "2.69-Good," which resulted in a negative condition adjustment of $667.39, and a positive condition adjustment of $170.00. (Id., pp. 2, 4.) The WCTL system determined the market value of Larson's vehicle was $7,793.10, and after subtracting her deductible, Progressive sent a settlement payment of $7,293.10. (Id., p. 2.)

Larson accepted the payment and did not contest the settlement amount.

Neither Richardson nor Larson had any interaction with Mitchell International or J.D. Power (collectively the WCTL Defendants) during the claim and settlement process, or at any time prior to the lawsuit.

**E. Plaintiffs' Complaint**

Richardson and Larson filed a five-count Class Action Complaint (Doc. #26) (the Complaint) in state court, which was removed to federal court pursuant to the Class Action Fairness Act. As currently constituted after resolution of a motion to dismiss, the following claims are asserted:

In Count I, plaintiffs allege that Progressive breached its contract (the insurance Policies) by (a) "failing to properly investigate and confirm the statistical validity of the WCTL Valuation methodology," and (b) "wrongful failure to properly adjust and pay the amount due and owed to the plaintiffs for their total losses, sufficient for plaintiffs to obtain comparable replacement vehicles." (Doc. #26, ¶ 92.) Richardson alleges that the breaches deprived him of $1,455.06, which is the approximate amount of the downward condition adjustment to his vehicle. (Id., ¶ 66.) Larson alleges that the breaches deprived her of $667.39, the amount of the downward condition adjustment to her vehicle. (Id., ¶ 70.) This is the only count against Progressive.

In Count III[7], plaintiffs allege that J.D. Power and Mitchell International "wrongfully interfered with Progressive's contractual obligations to Plaintiffs by knowingly and intentionally selling to Progressive a statistically invalid and wholly arbitrary total loss valuation product for the specific purpose of enabling Progressive to underpay the claims of total loss insureds, including Plaintiffs." (Id., ¶ 107.)  In Count IV, plaintiffs claim to be third-party beneficiaries of the contract between Progressive and Mitchell International concerning the valuation methodology of total loss claims.  Plaintiffs sue J.D. Power and Mitchell International for breach of contract for "providing Progressive with total loss valuations that were not statistically valid and were wholly arbitrary in the manner in which Progressive valued total losses, including Plaintiffs' total losses." (Id., ¶ 113.)  In Count V, plaintiffs alleged a civil conspiracy between J.D. Power and Mitchell International to "utilize WCTL Valuations to provide improper total loss valuations." (Id., ¶ 117.)

All counts incorporate language which alleges that Florida law, and therefore the Policies, require that when a vehicle is declared a total loss the insurer must pay a cash settlement based upon the actual cost to purchase a comparable motor vehicle,

---

[7] Count II was previously dismissed.  (Doc. #55.)

including sales tax. (Doc. #26, ¶¶ 3, 30, 32, 46, 52.)  This is required, the Complaint alleges, by the Claims Settlement Practices section of the Florida Unfair Insurance Trade Practices Act (FUITPA), Fla. Stat. § 626.9743(5) (referred to in the Complaint as "Florida's Total Loss Statute").  (Id., ¶¶ 18-20.) The Complaint alleges that each step of the WCTL system used by Progressive is "statistically invalid" (Id., ¶ 41), and the methodology for making downward condition adjustments is completely invalid.  (Id., ¶ 43.)  The Complaint asserts that the dollar amounts assigned to the condition adjustments are "improper in all respects and should be disregarded in valuing a Progressive insured's total loss vehicle."  (Id., ¶¶ 44.)

**F. Class Action Allegations**

Plaintiffs seek to certify one statewide Florida class with two subclasses, asserting they have satisfied all the requirements of Rule 23 of the Federal Rules of Civil Procedure. With certain exclusions, the class and subclasses are defined as:

> A Statewide Florida Class defined as: All persons and entities that have made first-party claims since October 1, 2012, under an automobile insurance policy issued within the state of Florida by Progressive whose vehicles were declared a total loss by Progressive and were valued using J.D. Power and Mitchell's WCTL system.

> A Condition Adjustment Subclass defined as: All Florida insureds whose total loss claims were reduced by negative or downward condition adjustments; and

> A Market Value Subclass defined as: All Florida insureds whose vehicles received Market Values and Settlement Amounts as determined by WCTL Valuations which were less

than the actual Retail Values for each vehicle as required by Florida Statute § 626.9743(5)(a)(2)(b), as determined by Guidebooks.

(Doc. #26, ¶¶ 71, 75-76.)  Plaintiffs allege that both subclasses satisfy the numerosity, commonality, typicality, and adequacy requirements (Id., ¶¶ 77-80), as well as the predominance and superiority requirements.  (Id., ¶ 81.)

For the condition adjustment subclass, plaintiffs assert that damages are measured by the dollar amount of the downward condition adjustments on a total loss vehicle.  (Id., ¶ 84.)  For the market value subclass, plaintiffs assert that damages are measured by the difference between the amount paid by Progressive, using the WCTL system, and what would have been the value of the total loss vehicles using Guidebook retail valuations.  (Id., ¶¶ 82-88.)  Plaintiffs also assert that "final injunctive relief is appropriate as to the Class as a whole" (Doc. #26, ¶ 89) and that the injunction should "prohibit Progressive from continuing to utilize WCTL Valuations in Florida."  (Id., p. 26, ¶ H.)

Additional facts will be set forth below as necessary to resolve specific issues.

## II.  General Class Certification Principles

Class actions are an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (citation omitted).  "The initial burden of proof to

14

establish the propriety of class certification rests with the advocate of the class." Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1265 (11th Cir. 2009) (quoting Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181, 1187 (11th Cir. 2003)). This is not simply a pleading burden, but requires a factual showing that all the class action requirements are satisfied. Brown v. Electrolux Home Products, Inc., 817 F.3d 1225, 1234 (11th Cir. 2016).

The Eleventh Circuit has summarized the class action certification requirements and process as follows:

> Rule 23 of the Federal Rules of Civil Procedure lays down the ground rules for certifying a class action. To win certification under Rule 23, every class must present a named plaintiff who has standing to bring the claim. See Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000). Every class must be "adequately defined and clearly ascertainable." Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012) (citation omitted). And every class must satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Id.
>
> From there, the rules differ depending on what type of class the plaintiff purports to represent. For an injunction class under Rule 23(b)(2), the plaintiff must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). For a damages class under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because these rules establish different threshold certification requirements and different procedural safeguards—protective of both defendants and absent class members—it is important that courts insist on the proper treatment of different types of classes. Injunction classes can go forward under Rule 23(b)(2); damages classes must satisfy Rule 23(b)(3). See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 361–63, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co., 938 F.3d 1170, 1174 (11th Cir. 2019)(footnote omitted.)

Whether to certify a class is a matter within the discretion of the district court. Moore v. Am. Fed'n of TV & Radio Artists, 216 F.3d 1236, 1241 (11th Cir. 2000). A district court must conduct a "rigorous analysis" of the Rule 23 prerequisites before certifying a class, and must look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law to determine the certification issues. Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013); Vega, 564 F.3d at 1266. While the court "should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." Valley Drug Co., 350 F.3d at 1188, n.15.

### III.   Florida Total Loss Statute

Much of plaintiffs' class certification request, as well as their underlying claims, are informed by plaintiffs' interpretation of what they refer to as the Florida Total Loss statute, Fla. Stat. § 626.9743(5).  The Court therefore begins with the statute.

In general, as its caption states, Fla. Stat. § 626.9743 imposes certain "Claim Settlement Practices Relating to Motor Vehicle Insurance."  The statute applies to the adjustment and settlement of personal and commercial motor vehicle insurance claims.  Fla. Stat. § 626.9743(1).  The relevant portion of the statute, Fla. Stat. § 626.9743(5), has a narrower application, and provides in full:

> (5)  When the insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, the insurer shall use one of the following methods:
>
>  (a) The insurer may elect a cash settlement based upon the actual cost to purchase a comparable motor vehicle, including sales tax, if applicable pursuant to subsection (9). Such cost may be derived from:
>
>   1. When comparable motor vehicles are available in the local market area, the cost of two or more such comparable motor vehicles available within the preceding 90 days;
>
>   2. The retail cost as determined from a generally recognized used motor vehicle industry source such as:
>
>    a. An electronic database if the pertinent portions of the valuation documents generated

by the database are provided by the insurer to the first-party insured upon request; or

b. A guidebook that is generally available to the general public if the insurer identifies the guidebook used as the basis for the retail cost to the first-party insured upon request; or

3. The retail cost using two or more quotations obtained by the insurer from two or more licensed dealers in the local market area.

(b) The insurer may elect to offer a replacement motor vehicle that is a specified comparable motor vehicle available to the insured, including sales tax if applicable pursuant to subsection (9), paid for by the insurer at no cost other than any deductible provided in the policy and betterment as provided in subsection (6). The offer must be documented in the insurer's claim file. For purposes of this subsection, a comparable motor vehicle is one that is made by the same manufacturer, of the same or newer model year, and of similar body type and that has similar options and mileage as the insured vehicle. Additionally, a comparable motor vehicle must be in as good or better overall condition than the insured vehicle and available for inspection within a reasonable distance of the insured's residence.

(c) When a motor vehicle total loss is adjusted or settled on a basis that varies from the methods described in paragraph (a) or paragraph (b), the determination of value must be supported by documentation, and any deductions from value must be itemized and specified in appropriate dollar amounts. The basis for such settlement shall be explained to the claimant in writing, if requested, and a copy of the explanation shall be retained in the insurer's claim file.

(d) Any other method agreed to by the claimant.

Fla. Stat. § 626.9743(5).

Certain aspects of this Florida statute are relevant to the class certification issues, as well as the underlying claims.

- **Fla. Stat. § 626.9743(5) Applies To The Progressive Policies**

As a general matter,

> "[i]t is fundamental that the laws of Florida are a part of every Florida contract." Dep't of Ins., State of Fla. v. Teachers Ins. Co., 404 So.2d 735, 741 (Fla. 1981). "[A]ll existing applicable or relevant and valid statutes, ... at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention." Northbrook Prop. & Cas. Ins. Co. v. R & J Crane Serv., Inc., 765 So.2d 836, 839 (Fla. Dist. Ct. App. 2000) (quotation marks omitted); Gordon v. State, 608 So.2d 800, 802 (Fla.1992) ("Valid laws in effect at the time a contract is made enter into and become part of the contract as if expressly incorporated into the contract.").

Shelton v. Liberty Mut. Fire Ins. Co., 578 F. App'x 841, 845 (11th Cir. 2014). Additionally, the Policies themselves "conform" their terms to Florida law. (Doc. #29-1, p. 40.) But the settlement practice requirements set forth in Fla. Stat. § 626.9743(5) do not apply to every motor vehicle insurance policy. Rather, § 626.9743(5) only applies to first-party claims[8] involving total loss vehicles covered by insurance policies which provide for adjustment and settlement "on the basis of actual cash value or replacement with another vehicle of like kind and quantity." Fla. Stat. § 626.9743(5). Here, the claims at issue were first-party

---

[8] A "first party claim" is "a claim between an insurer and its insured not involving a fiduciary relationship between them." ManhNat. Life. Ins. Co. v. Kujawa, 522 So. 2d 1078, 1080 (Fla. 4th DCA 1988).

claims, the vehicles were determined to be total losses, and the Policies involve adjustment and settlement on the basis of actual cash value or replacement with another vehicle of like kind and quantity.  The obligations imposed by Fla. Stat. § 626.9743(5) therefore apply to the Policies.

- **Fla. Stat. § 626.9743(5) Requirements Are Mandatory**

When § 626.9743(5) applies to an insurance policy, as here, an insurer "shall use" one of the methodologies set forth in the statute.  Fla. Stat. § 626.9743(5).  The Court agrees with Glover v. Liberty Mut. Ins. Co., 418 F. Supp. 3d 1161, 1167 (S.D. Fla. 2019), that the statutory "shall use" is a command upon the insurer.

- **The Obligations Imposed By Fla. Stat. § 626.9743(5)**

Where an insurance policy requires payment of actual cash value or replacement value, the statute establishes alternative methods an insurer must use to arrive at such values.  Florida Statute § 626.9743(5) does not define "actual cash value" or "replacement value," and does not require an insurer to pay actual cash value or replacement value.  Generally, however, Florida case law has defined these terms:

> "Replacement cost insurance is designed to cover the difference between what property is actually worth and what it would cost to rebuild or repair that property. Replacement cost is measured by what it would cost to replace the damaged structure on the same premises.

> In contrast to a replacement cost policy, actual cash value is generally defined as "fair market value" or "[r]eplacement cost minus normal depreciation," where depreciation is defined as a "decline in an asset's value because of use, wear, obsolescence, or age." In other words, replacement cost policies provide greater coverage than actual cash value policies because depreciation is not excluded from replacement cost coverage, whereas it generally is excluded from actual cash value."

Trinidad v. Fla. Peninsula Ins. Co., 121 So. 3d 433, 438 (Fla. 2013)(internal citations and punctuation omitted.)

The statute gives the insurer four possible methodologies to use with qualifying total loss claims. First, an insurer may elect to offer "a cash settlement based upon the actual cost to purchase a comparable motor vehicle, including sales tax, . . ." Fla. Stat. § 626.9743(5)(a). If this method is used, the insurer may derive the actual cost to purchase a comparable motor vehicle from any of three sources: (1) The cost of two or more comparable motor vehicles in the local market area which were available within the preceding 90 days; or (2) The retail cost of such a comparable motor vehicle as determined from a "generally recognized used motor vehicle industry source.";[9] or (3) The retail cost, determined by

---

[9] Statutory examples of such industry sources are:

> a. An electronic database if the pertinent portions of the valuation documents generated by the database are provided by the insurer to the first-party insured upon request; or

using two or more quotations obtained by the insurer from two or more licensed dealers in the local market area.  <u>See</u> Fla. Stat. § 626.9743(5)(a)(1)-(3).

Second, an alternative method allows an insurer to offer a comparable replacement motor vehicle paid for by the insurer at no cost other than certain permissible deductions.  The comparable vehicle must comply with certain conditions, and the insurer who utilizes this alternative must document the offer in its file. Fla. Stat. § 626.9743(5)(b).

Third, the statute allows an insurer to adjust or settle a motor vehicle total loss claim on a basis that varies from the first two methods.  If such other methodology is used, the insurer must comply with certain procedural requirements.  Fla. Stat. § 626.9743(5)(c).

Fourth, an insurer may use "[a]ny other method agreed to by the claimant."  Fla. Stat. § 626.9743(5)(d).

---

b. A guidebook that is generally available to the general public if the insurer identifies the guidebook used as the basis for the retail cost to the first-party insured upon request;

Fla. Stat. § 626.9743(5)(a)(2).

Noticeably absent from Fla. Stat. § 626.9743(5) is a requirement that any of the four methodologies be "statistically valid." That term is not used anywhere in the statute. Indeed, the alternative methodologies approved by the statute are inherently *not* statistically valid.

All parties agree that the second alternative is not involved in this case since there was no offer of a comparable replacement vehicle. Accordingly, Fla. Stat. § 626.9743(5)(b) need not be further discussed. Plaintiffs focus their claim on Progressive's alleged failure to comply with Fla. Stat. § 626.9743(5)(a), arguing that § (5)(c) and § (5)(d) are not applicable. At oral argument, counsel for Progressive asserted that the WCTL system complied with §§ (5)(a), (c), and (d).

## IV.   Application of Class Action Principles

Plaintiffs assert they have satisfied all the requirements for proceeding as a class action, while defendants assert that plaintiffs have established almost none of the requirements. The Court addresses each requirement in turn.

### A.   Adequately Defined and Clearly Ascertainable Classes

"Class representatives bear the burden to establish that their proposed class is 'adequately defined and clearly ascertainable,' and they must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)." Cherry v. Dometic Corp.,

986 F.3d 1296, 1302 (11th Cir. 2021) (quoting <u>Little v. T-Mobile</u>
<u>USA, Inc.</u>, 691 F.3d 1302, 1304 (11th Cir. 2012)).

**(1) Adequacy of Class Definitions**

"Without an adequate class definition, a district court
would be unable to evaluate whether a proposed class satisfies
Rule 23(a)." <u>Cherry</u>, 986 F.3d at 1303. To be adequately defined,
a proposed class must accurately describe the putative class
members. If a class is overbroad it should be redefined more
narrowly. <u>Cordoba v. DIRECTV, LLC</u>, 942 F.3d 1259, 1276 (11th Cir.
2019) (citing <u>Kohen v. Pacific Inv. Mgmt. Co. LLC</u>, 571 F.3d 672,
678 (7th Cir. 2009)). The mere presence of uninjured class members
does not necessarily preclude class certification, but "a class
should not be certified if it is apparent that it contains a great
many persons who have suffered no injury at the hands of the
defendant." <u>Id.</u> at 1276 (quoting <u>Kohen</u>, 571 F.3d at 677).

As noted previously, plaintiffs propose the following class
and subclasses:

> <u>A Statewide Florida Class defined as</u>: All persons and
> entities that have made first-party claims since October
> 1, 2012, [on] an automobile insurance policy issued
> within the state of Florida by Progressive whose
> vehicles were declared a total loss by Progressive and
> were valued using J.D. Power and Mitchell's WCTL system.

> <u>A Condition Adjustment Subclass defined as</u>: All Florida
> insureds whose total loss claims were reduced by
> negative or downward condition adjustments; and

> <u>A Market Value Subclass defined as</u>: All Florida insureds
> whose vehicles received Market Values and Settlement
> Amounts as determined by WCTL Valuations which were less

> than the actual Retail Values for each vehicle as
> required by Florida Statute § 626.9743(5)(a)(2)(b), as
> determined by Guidebooks.

(Doc. #26, ¶¶ 71, 75-76.)  Progressive states in its Answer that

the class and subclasses are not "properly defined," (Doc. #56, ¶¶

71, 75-76), but provides no further discussion in its other

documents.

As defined, the statewide class definition is overbroad

because plaintiffs seek to include all total loss vehicle claimants

in its Statewide Florida Class, including those who have not

suffered any damages.  Unless the total-loss settlement amount was

actually less than claimant was due, there is no cause of action

for breach of contract.

The following modified class definition is adequately defined

given the circumstances of the case:

> All persons and entities that have made first-party
> claims on or after October 1, 2012, on a vehicle
> insurance policy issued by Progressive American
> Insurance Company or Progressive Select Insurance
> Company within the state of Florida for a vehicle which
>
> (1)  was declared a total loss by either Progressive
>      company, and
>
> (2)  was valued using the J.D. Power and Mitchell
>      International Work Center Total Loss (WCTL) system;
>
>      and
>
> (3)  whose vehicle valuation was either:
>
>      (a)  reduced by a negative or downward
>           condition adjustment to the vehicle; or

> (b)  given  a  vehicle  market  value  and
> settlement  amount  less  than  the  actual  retail
> value  for  the  vehicle  as  determined  by  the
> NAPA Guidebook; or
>
> (c) Both (a) and (b).

**(2) Ascertainability of the Class**

"[A]scertainability — at least as traditionally understood — is an implied prerequisite to the requirements of Rule 23(a)." Cherry, 986 F.3d at 1302–03.  In the Eleventh Circuit, this does not include the concept of administrative feasibility in connection with the Rule 23(a) determination.

> We hold that administrative feasibility is not
> a requirement for certification under Rule 23.
> In doing so, we limit ascertainability to its
> traditional  scope:  a  proposed  class  is
> ascertainable if it is adequately defined such
> that  its  membership  is  capable  of
> determination.  Our  decision  might  render
> redundant the phrase in our precedent that a
> proposed class must be "adequately defined and
> clearly ascertainable."  But  "[d]oublets ...
> abound in legalese," and this one is required
> by Rule 23.

Cherry, 986 F.3d at 1304 (internal citations omitted).

Plaintiffs rely primarily on the testimony of Michael Silver, Progressive's designated representative regarding its electronic database, to establish that the proposed class is ascertainable. Plaintiffs  contend  Mr.  Silver's  testimony  establishes  that Progressive's database can generate a list of potential class members. (Doc. #87-11, pp. 3-10, 12-14.)  None of the defendants have argued otherwise.  The Court finds the plaintiffs have met

their burden of showing that the membership in both the originally-defined class and sub-classes and the modified class is ascertainable within the meaning of Rule 23(a).

**B.   Standing of At Least One Plaintiff**

The Court must next determine whether the putative class, as modified, may be pursued by *these* plaintiffs.   "[I]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." Fox v. Ritz-Carlton Hotel Co., L.L.C., 977 F.3d 1039, 1046 (11th Cir. 2020) (quoting Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)); see also AA Suncoast Chiropractic Clinic, P.A., 938 F.3d at 1174.   A plaintiff "bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter." Carney v. Adams, 141 S. Ct. 493, 498 (2020).   To have standing to represent a class, a party must "be part of the class and possess the same interest and suffer the same injury as the class members." Prado-Steiman ex rel. Prado, 221 F.3d at 1279. "[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." Mills v. Foremost Ins. Co., 511 F.3d 1300, 1307 (11th Cir. 2008)(citation omitted.)   Whether a plaintiff

has "standing as putative class representatives is an issue distinct from whether they qualify under Rule 23 to represent the class." <u>Id.</u>

It is not disputed that both named-plaintiffs have standing to assert the claims set forth in the proposed Condition Adjustment Subclass, currently phrased as § 3(a) of the Court's modified class definition. Both the allegations in the Complaint (Doc. #20, ¶¶ 66, 70) and the material submitted for consideration of class certification clearly establish that each named-plaintiff satisfies the standing requirements for this portion of the class.

As pled in the Complaint, however, neither named-plaintiff would satisfy the Market Value sub-class of the proposed class or § 3(b) of the Court's modified class definition. According to the Complaint, the value of each named-plaintiff's vehicle was reduced by condition adjustments, and the condition adjustments are all the damages either claimed in the Complaint. (Doc. #20, ¶¶ 66, 70.) The Complaint does not allege damages to the named-plaintiffs based upon a market value theory.

Near the end of oral argument, the Court asked plaintiffs' counsel if either named-plaintiff were members of the proposed Market Value sub-class. Counsel asked for and received permission to submit a post-hearing document addressing that issue. The parties submitted a Joint Submission Regarding "Market Value Subclass" (Doc. #119) which set forth the parties' disagreement as

to the answer to the Court's question.  To oversimplify, plaintiffs both assert they are members of the Market Value Subclass, while defendants essentially assert the answer to the Court's question is "it depends."  Because it is reasonably possible for each plaintiff to be a member of the proposed subclass under certain factual circumstances, the Court concludes that each plaintiff also satisfies the standing requirements for § 3(b) of the Court's modified class definition.

### C. Other Rule 23(a) Requirements

Having determined that the class definition as modified is adequate, that the class is ascertainable, and that plaintiffs have sufficiently shown standing, the Court proceeds to the other Rule 23(a) requirements.

### (1) Numerosity

Rule 23(a)(1) requires that the class is so numerous that joinder of all members is impractical.  Fed. R. Civ. P. 23(a)(1); Vega, 564 F.3d at 1266-67.  There is no specific number of class members necessary to show the impracticability of joinder, and it is not necessary that the precise number of class members be known. Id.  The numerosity requirement, therefore, presents a "generally low hurdle." Id. at 1267.

Plaintiffs assert that in 2017, Progressive had over 30,000 Florida claims in which total loss determinations were made using the WCTL system, and that in 2018 Progressive processed in excess

of 25,000 total loss claims using the WCTL system. (Doc. #1-3, ¶¶ 3-5.)  Because Progressive has used the WCTL system since 2012, plaintiffs believe there are likely thousands of other claims within the purposed class period. (Doc. #82-24, pp. 21-22.) Progressive did not address the issue of numerosity in its Response, while the WCTL Defendants state they do not contest plaintiffs' claim that Rule 23(a)(1)'s numerosity requirement is satisfied. (Doc. #98; Doc. #99, p. 19 n.5.)  The Court finds plaintiffs have proven there are in fact sufficiently numerous members in the modified proposed class to meet the numerosity requirement of Rule 23(a)(1).

### (2) Commonality

The commonality requirement under Rule 23(a)(2) demands that there be questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2). Commonality does not require that "all" the questions of law and fact raised by the dispute be common, or that common questions of law or fact "predominate" over individual issues.  See Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1557 (11th Cir. 1986); Wal-Mart Stores, Inc., 564 U.S. at 359 ("for purposes of Rule 23(a)(2) 'even a single common question' will do.").  Rather, commonality demands that the class members suffer the same injury and "that there be at least one issue whose resolution will affect all or a significant number of the putative class members." Wal-Mart Stores, Inc., 564 U.S. at 350.

The Complaint asserts there are multiple questions of law or fact that are common to every class member. (Doc. #26, ¶ 78(a)-(k)).[10] But, according to plaintiffs, the two central common issues are whether Progressive's use of the WCTL system violates Florida's Total Loss Statute, § 626.9743(5)(a), and whether the WCTL is statistically invalid such that its use results in improper valuations which underpay total loss insurance claims. (Doc. #82-24, pp. 26-27; Doc. #103, p. 9.)   Since all total loss claims

---

[10]   The following common questions of law or fact were identified by plaintiffs in the Complaint:

a.   Whether Progressive failed to properly investigate and determine that WCTL valuations are statistically invalid;

b.   Whether Progressive has actual knowledge that WCTL Valuations are statistically invalid;

c.   Whether Florida law required Progressive to pay actual cash value to its Florida insureds;

d.   Whether Progressive's Florida Policy required it to pay actual cash value to its Florida insureds;

e.   Whether Progressive breached its contracts of insurance with its Florida insureds by improperly underpaying total loss claims through the use of statistically invalid J.D. Power/Mitchell valuations;

f.   Whether Progressive failed to pay actual cash value to its Florida insureds;

g.   Whether WCTL valuations represent the actual cash value of the vehicles at the time of the loss;

h.   Whether Progressive has intentionally and systemically underpaid total loss claims to plaintiffs and the class by using statistically invalid WCTL valuations;

i.   Whether plaintiffs and the class have sustained damages;

j.   Whether Defendants have been unjustly enriched as a result of the scheme described herein; and,

k.   Whether Progressive, J.D. Power and Mitchell have conspired, as alleged herein.

(Doc. #26, ¶ 78(a)-(k).)

within the class period were processed using the WCTL system, plaintiffs assert these two issues provide the required commonality. (Doc. #82-24, pp. 22-23.)

Progressive responds that none of the "common questions" could possibly drive common answers which would materially advance the claims. Progressive asserts that (1) issues about its intent are irrelevant to the only claim against it, a breach of contract claim; (2) questions about whether it's methodology complied with Florida law or whether the WCTL system is "statistically invalid" are the type of open-ended, high level questions found to be insufficient in Wal-Mart Stores, Inc., 564 U.S. at 350, because any answer would not further resolution of the key questions of whether class members had been injured and, if so, by how much; (3) plaintiffs have presented no evidence of a common injury, and (4) plaintiffs would effectively waive claims of undervaluation by certain class members. (Doc. #98, pp. 33-35.)

The WCTL Defendants respond that plaintiffs have not identified any common issues whose answers would drive a class-wide resolution against them, as opposed to Progressive. The WCTL Defendants contend that resolution of the Total Loss Statute issues is irrelevant to them since the statute only applies to insurers. The WCTL Defendants assert that it is undisputed that neither J.D. Power nor Mitchell International is an insurer, and neither had any contact with either plaintiffs or Progressive about the claims.

(Doc. #99, pp. 19-21.)   Additionally, the WCTL Defendants assert that the statistical validity of the WCTL valuations is not a common question because neither the Policies nor the Florida statute requires statistical validity.   (Doc. #99, pp. 21-23.)

Plaintiffs reply that the Court's prior ruling (Doc. #55) found that sufficient facts were alleged against the WCTL Defendants to deny their Motion to Dismiss regarding plaintiffs' claims of tortious interference (Count III), breach of contract arising from Plaintiffs' status as third-party beneficiaries (Count IV), and a civil conspiracy claim (Count V).   Plaintiffs therefore argue that whether the WCTL system is an acceptable methodology under Florida law squarely applies to the WCTL Defendants.   (Doc. #104, pp. 1-2.)

The Court is not persuaded by plaintiffs' argument that its prior ruling (Doc. #55) resolves any material issue as to class certification, and it certainly did not determine that statistical validity is required by Florida Statute § 626.9743(5)(a).   The Court is also unpersuaded by defendants' assertions that commonality cannot be established because the amount of damages to each class member, if any, is not subject to common answers or is highly individualized. The issue of ultimate liability is more appropriately discussed under the predominance analysis, *infra*. See, e.g., Amchem Prods. V. Windsor, 521 U.S. 591, 623 (1997)("Even if Rule 23(a)'s commonality requirement may be satisfied . . . the

predominance criterion is far more demanding." (citation omitted)).

The Court finds that the overarching issue of whether the WCTL system violates the requirements of Florida Statute § 626.9743(5)(a) when determining the "actual cash value" of total loss vehicles satisfies the commonality requirement. Resolution of the issue "will resolve an issue that is central to the validity of . . . the class members claims in one stroke" with respect to the modified class. Wal-Mart Stores, Inc., 564 U.S. at 350, 359; see Gautreaux v. La. Farm Bureau Cas. Ins., 280 So. 3d 694, 705 (La. App. 3 Cir. Oct. 2, 2019) (affirming trial court's finding that whether the WCTL program violated La. R.S. § 22:1892 was a common question, the resolution of which would apply across the board to all class members).

### (3) Typicality

Plaintiffs may utilize a class action suit "only if: . . . (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . ." Fed. R. Civ. P. 23(a)(3). "Class members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist 'a sufficient nexus . . . between the legal claims of the named class representatives and those of individual class members to warrant class certification.'" Ault v. Walt Disney World Co., 692 F.3d 1212, 1216 (11th Cir. 2012) (citing Prado-Steiman, 221 F.3d

at 1278-79). "This nexus exists 'if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" Ault, 692 F.3d at 1216.  See also Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1322 (11th Cir. 2008); Murray v. Auslander, 244 F.3d 807, 811 (11th Cir. 2001).  In other words, where the same course of conduct is directed at both the named plaintiff and the members of the proposed class, the typicality requirement is met. Kennedy v. Tallant, 710 F.2d 711, 717 (11th Cir. 1983).

Plaintiffs argue the typicality requirement is satisfied because plaintiffs and class members were victimized by the same misconduct in the same manner, i.e., "Defendants' unlawful . . . scheme of settling total loss vehicle claims for substantially less than the actual replacement costs of such vehicles by using the WCTL methodology, which since 2012, has been Progressive's standard and regular claims handling practice for adjusting all Florida total loss claims." (Doc. #82-24, p. 24; Doc. #103, p. 10.)

Defendants respond that there are unique aspects to the claims of Richardson and Larson which preclude a finding of typicality. Defendants argue that Larson is atypical because she contests the "numerical condition rating" assigned to her total loss vehicle (a claim which class counsel has given up for the other putative class members), and she was "solicited out of the blue" by her counsel

35

to engage in the current litigation (which raises significant
ethical issues not present for other putative class members).
Likewise, defendants argue Richardson does not satisfy the
typicality requirement for several reasons: Richardson was
represented by counsel at the time he accepted his total loss
valuation, thus providing a basis for a waiver defense which is
not typical of other potential class members; he was missing a row
of seats in his vehicle at the time of the WCTL valuation, making
his vehicle so far out of the ordinary as to be atypical; and he
was the beneficiary of GAP insurance coverage that resulted in no
out-of-pocket damages. (Doc. #98, pp. 35-37; Doc. #99, pp. 30-
32.)

There are indeed unique factual settings for both Richardson
and Larson, but these do not defeat the relatively low burden of
showing typicality. Both named-plaintiffs assert they had first
party total-loss vehicle claims determined by the WCTL system,
which claims were paid by Progressive in amounts less than were
due under the Policies. The WCTL methodology used to adjust all
total loss vehicle claims for Progressive's insureds has not
materially changed since 2012. Issues of legal representation,
missing seats in a vehicle, subjective expectations, GAP insurance
coverage, or alleged ethical concerns do not detract from the fact
that since 2012 Progressive has used the WCTL system to value
total-loss vehicle claims in Florida, a course of conduct that is

common to plaintiffs and the purported class members.  Because the claims of the plaintiffs and class members arise from the same course of conduct, the Court finds the typicality requirement is met.  Ault, 692 F.3d at 1216; Kennedy, 710 F.2d at 717.

### (4) Adequacy of Representation of Plaintiffs and Counsel

Federal Rule of Civil Procedure 23(a)(4) requires that the parties representing a class fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4); London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1253 (11th Cir. 2003).  This requirement "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  Busby, 513 F.3d at 1323; Valley Drug Co., 350 F.3d at 1189.

Additionally, class counsel must fairly and adequately represent the interests of the class.  Fed. R. Civ. P. 23(g)(4). "This requirement, aimed at ensuring the rights of absent class members are vigorously protected, is not satisfied where class counsel represents parties whose interests are fundamentally conflicted."  W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co., 737 F. App'x 457, 464 (11th Cir. 2018) (citations omitted). Indeed, putative class counsel owe fiduciary duties to the class as a whole.  Med. & Chiropractic Clinic, Inc. v. Oppenheim, 981 F.3d 983, 990 (11th Cir. 2020).

Plaintiffs assert that they and their attorneys will fairly and adequately protect the interests of the class, and that there are no conflicts because plaintiffs' interests are common and typical of the class. (Doc. #82-24, pp. 24-25.) Defendants see it otherwise.

### (a)   Adequacy of Plaintiffs' Representation of Class

Defendants assert both that there are substantial conflicts of interest between the named-plaintiffs and the other putative class members and that the named-plaintiffs will not adequately prosecute the action.  The Court discusses each in turn.

### (1)   Conflicts of Interest Between Plaintiffs and Class

Plaintiff Larson believes the numerical condition ratings given to the component or subcomponent of her vehicle were inaccurate.  Class counsel has strategically chosen not to assert such an otherwise ripe claim on behalf of Larson or the putative class. Defendants argue that this creates a conflict of interest. While Larson may be willing to forego such claims, Defendants contend that this demonstrates plaintiffs are inadequate representatives since they have abandoned meaningful claims upon which absent class members could potentially prevail. (Doc. #99, pp. 23-25.)  Additionally, defendants argue, certifying such a class would run afoul of the longstanding Florida rule against claim splitting, which "requires that all damages sustained or accruing to one as a result of a single wrongful act must be

38

claimed." Comer v. City of Palm Bay, 147 F. Supp. 2d 1292, 1296 (M.D. Fla. 2001); (Doc. #98, pp. 28-30).

Plaintiffs respond that the failure to challenge the numerical component and sub-component ratings does not create a conflict of interest because the numerical component ratings would not translate into a corresponding dollar figure of damages if plaintiffs are successful in showing the WCTL system is invalid. Plaintiffs also assert that "claim splitting" does not apply. If the Court determines the WCTL methodology is invalid under Florida's Total Loss statute, there will be no subsequent litigation about the dollar values assigned to the condition adjustments because Progressive would necessarily be precluded from ever relying on the WCTL system. (Doc. #103, pp. 10-11).

"[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." Valley Drug Co., 350 F.3d at 1189; Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000). A fundamental conflict of interest has been found, for example, "where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class," or where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of the unnamed class members. Valley Drug Co., 350 F.3d at 1189-90.

39

Larson stated she disagreed with the Progressive MMRs' conclusions about the numerical condition ratings for her vehicle, but the existence of such conditions is an unquestionably subjective, individualized determination.  As such, Larson's potential claim concerning condition ratings is not amenable to prosecution as a class action.  Plaintiffs give up nothing, while preserving the potential for a class action.  The Court finds that failing to include a claim alleging the inaccuracy of numerical condition ratings given to the component or subcomponent does not create a substantial conflict of interest, but is a reasonable litigation strategy. See O'Connor v. Uber Techs., Inc., 311 F.R.D. 547, 566 (N.D. Cal. 2015) ("[A] decision to abandon a claim that may not be certifiable does not automatically render a plaintiff inadequate, particularly when they seek the majority of the claims.").

### (2)  **Adequately Prosecute Claims**

Defendants also assert that plaintiffs are inadequate representatives of the class because of their minimal participation in and awareness of the litigation and their unfamiliarity of the basic facts and issues of the case.  (Doc. #99, p. 24.)  Specifically, defendants argue Richardson: (1)  has no personal knowledge of the alleged wrongdoing of defendants Mitchell or J.D. Powers; (2) has only spent four or five hours "looking at documents from time to time"; (3) is unaware of whether

a trial date is set in the instant case; (4) lacks any knowledge of who has authority to settle this lawsuit; (5) relies upon his attorneys to take care of the suit because he does not understand "most of this stuff"; (6) abdicated the conduct of the case to his attorney; and (7) is not motivated to prosecute this lawsuit and protect the interest of other class members, as evidenced by his lack of objection to his own settlement when represented by counsel. (Id.; Doc. #98-3, pp. 54-57; Doc. #99, pp. 25-26.)

Defendants object to Larson being an adequate representative of the class because: (1) she has "virtually no knowledge of the facts of this case" because she is objecting to her vehicle's numerical condition ratings, which class counsel has specifically disclaimed to avoid any individualized issue with the class; (2) when asked whether anything else in her valuation was inaccurate, Larson stated she "did not believe so," which shows a clear lack of knowledge of the claims being asserted or waived in this case; (3) Larson lacks knowledge of the claims against Mitchell International and J.D. Power; and (4) Larson totally abdicated the conduct of her case to her attorneys. (Doc. #99, pp. 26-27; Doc. #98-4, pp. 48-50, 52, 59-60, 86-89, 78-79, 100-01.)

Plaintiffs respond that they have no interests that are antagonistic to the class, they seek no preferential treatment, and their common goal is to remedy defendants' conduct and obtain meaningful relief for all class members. (Doc. #104, p. 4.)

Richardson argues that he is an adequate representative of the class because his settlement from the WCTL valuation was not even enough to cover the outstanding value of his vehicle loan. (Id., p. 5.) Furthermore, he contends his refusal to reveal the substance of his privileged discussions with his counsel while being cross-examined during his deposition is evidence of his willingness to represent the class with vigilance. (Id.)

Larson contends she will adequately represent the class because, like Richardson, the total loss settlement she received from Progressive was inadequate to purchase a comparable vehicle after her truck was totaled. (Id., p. 6.) Larson avers that she has reviewed pertinent documents in this case, including the Complaint and the WCTL valuation of her total loss vehicle. (Id., pp. 6-7.) Finally, Larson argues that taking issue with the numerical condition ratings assigned to her vehicle's components and subcomponents (the tires, paint, interior stains) in the WCTL total loss valuation does not make her adequacy suspect, since she is not required to have identical claims to all class members. (Id., p. 7.)

Because "the issue of adequate class representation arises in a wide variety of contexts," neither the Eleventh Circuit nor the Supreme Court "has set forth standards for determining the adequacy of class representatives." London, 340 F.3d at 1254 (quotation and citation omitted). "Adequate class representation generally

does not require that the named plaintiffs demonstrate to any particular degree that individually they will pursue with vigor the legal claims of the class." Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th Cir. 1987). A class representative is not required to understand the meaning of complex legal terms or to direct litigation strategies. Id. at 728. However, if the named plaintiff's "participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case" then the class must not be certified. Butterworth v. Quick & Reilly, 171 F.R.D. 319, 322 (M.D. Fla. 1997) (quoting Kirkpatrick, 827 F.2d at 728).

The Court concludes the plaintiffs have carried their burden of proving their adequacy as class representatives. Plaintiffs have each responded to discovery requests, appeared for depositions, read the Complaint prior to its being filed, and are willing to testify and represent the class members at a trial. Their deposition testimony indicates at least a basic understanding of the claims — that the defendants improperly valued their total loss vehicles using the WCTL system causing them to receive less than full compensation for their vehicles. Plaintiffs are not required to have expert knowledge of all the details of the case. See Kirkpatrick, 827 F.2d at 728. See also Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 366 (1966). Lack of knowledge of the trial date has little significance. A class representative

43

does not necessarily provide inadequate representation if he or she fails to read the complaint after it is filed. Additionally, this is not a case in which plaintiffs have "abdicated their role in the case beyond that of furnishing their names as plaintiffs" and will adequately prosecute the action. Kirkpatrick, 827 F.2d at 726; Busby, 513 F.3d at 1323.

**(b)   Adequacy of Class Counsel**

Plaintiffs assert that their counsel satisfies Rule 23(g)(4) because they have extensive experience prosecuting class actions and other complex litigation, and have demonstrated their willingness to prosecute this litigation vigorously. Defendants do not question counsel's experience, qualifications or ability. Rather, they take issue with counsel's alleged ethical shortcomings, asserting that an attorney formerly with Morgan & Morgan improperly solicited professional employment from plaintiffs in violation of Florida Rule of Professional Conduct 4-7.18.[11]  Morgan & Morgan, while not disputing the contact with plaintiffs, vigorously denies any ethical impropriety.

"Misconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of

---

[11] Rule 4-7.18 in general prohibits lawyers from soliciting "professional employment from a prospective client with whom the lawyer has no family or prior professional relationship when a significant motive for the lawyer's doing so is pecuniary gain." Fla. Model Rules Of Prof 'l Conduct R. 4-7.18 (2020).

class certification." Creative Montessori Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 918 (7th Cir. 2011)(citation omitted).[12] "Serious doubt" exists when class counsel's misconduct "prejudices the class or creates a direct conflict between counsel and the class." Reliable Money Order, Inc. v. McKnight Sales Co., 704 F.3d 489, 498 (7th Cir. 2013). Unethical conduct that is "not necessarily prejudicial to the class" may nonetheless warrant denial of class certification when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case." Id. at 499.   On the other hand, a violation of the rules of professional conduct or other unethical behavior in litigating a class action "does not require[] [a court] to find [counsel] inadequate to represent the class." Busby, 513 F.3d at 1323. This is so because where "class counsel [] act[s] improperly, [t]he ordinary remedy is disciplinary action against the lawyer and remedial notice to class members, not denial of class certification." Id. at 1324 (citation and quotation omitted); Reliable Money Order, Inc., 704 F.3d at 498.

---

[12] Given the lack of Supreme Court or Eleventh Circuit authority establishing when counsel's unethical behavior warrants denial of class certification, district courts in this Circuit have applied the standard set forth by the Seventh Circuit Court of Appeals.  See Sliwa, 333 F.R.D. at 277-78; Powell v. YouFit Health Clubs, LLC, No. 17-cv-62328, 2019 U.S. Dist. LEXIS 28842, at *3 (S.D. Fla. Jan. 14, 2019); Keim v. ADF MidAtlantic, Ltd. Liab. Co., 328 F.R.D. 668, 689 (S.D. Fla. 2018).

It is not at all clear that there has been an ethical violation in connection with the initial contacts with plaintiffs. What is clear, however, is that the contacts described in the record neither create serious doubt that counsel will represent the class loyally nor jeopardize the Court's ability to reach a just and proper outcome in this case. Accordingly, the Court finds that plaintiffs have proven that the adequacy of counsel requirements are satisfied.

**D. Rule 23(b) Requirements**

Plaintiffs who satisfy the Rule 23(a) requirements must prove they also satisfy one of the Rule 23(b) requirements. Plaintiffs assert they satisfy Rule 23(b)(2) and (3), or in the alternative, Rule 23(b)(4). (Doc. #82-24, pp. 29-31.) Defendants argue that Plaintiffs satisfy none of these rules. The Court agrees with defendants.

**(1)  Rule 23(b)(2): Injunctive/Declaratory Relief**

Rule 23(b)(2) states that a class action may be maintained if Rule 23(a) is satisfied and:

> [T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(2). A class action may be maintained under Rule 23(b)(2) if "final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole."
AA Suncoast Chiropractic Clinic, P.A., 938 F.3d at 1174.

Plaintiffs assert that they have requested injunctive relief, that Progressive's unlawful practice of adjusting total loss claims is a uniform practice applicable to all members of the putative class, and that Progressive continues to implement the unlawful practice.   Therefore, Plaintiffs assert, they have satisfied the requirements of Rule 23(b)(2).  (Doc. #82-24, pp. 29-30.)

Progressive argues that certification as a Rule 23(b)(2) class is inappropriate. (Doc. #98, pp. 37-38.)  Progressive claims that any threat of future undervaluation of plaintiffs' total loss vehicles is too speculative to constitute a substantial likelihood of future injury, as required to establish Article III standing. (Id.) Additionally, Progressive argues that since plaintiffs primarily seek money damages, certification under Rule 23(b)(2) is unavailable, and plaintiffs must attempt to proceed under Rule 23(b)(3) (which Progressive also opposes.)   (Id., pp. 38-39.) Finally, Progressive suggests that Richardson may lack standing because he "had GAP insurance, which meant that he did not have to pay any money following the resolution of his claim, even though he had $6,894.00 outstanding on his car loan." (Id., p. 36.)

The WCTL Defendants assert that the request for injunctive relief is "apparently against Progressive only."  (Doc. #99, p.

27, n. 11.)   To the extent a response is necessary, they argue that neither plaintiff has standing to seek such relief because they are no longer Progressive policy holders and were not at the time the lawsuit was filed.  (Id.)

Plaintiffs reply that while they were not insured by Progressive at the time this lawsuit was filed, they still face future injury, and therefore they have standing to seek injunctive relief under Rule 23(b)(2). (Doc. #103, pp. 11-12.)  Plaintiffs describe this future injury as "the continued use of the WCTL valuation methodology in Florida for any total loss claim for which WCTL could apply."  (Id. at p. 11.)  Plaintiffs assert that such future injury is neither too contingent nor speculative because Progressive has used the WCTL methodology exclusively since 2012, and there is no evidence suggesting Progressive will switch to a different methodology that is recognized as valid under Florida's insurance statutes.  (Id.) "Any insurer at any point" is positioned to use the WCTL methodology, which, according to Plaintiffs, give them a concrete interest in determining the validity of the WCTL system and barring its future application in Florida's total loss claims.  (Id. at 11-13.)

There are only two places in the Complaint where plaintiffs mention declaratory or injunctive relief.  At the conclusion of the paragraphs which are generally applicable to the claims, plaintiffs state: "Defendants have acted, or refused to act, in a

manner that applies generally to the Class, such that final injunctive relief is appropriate as to the Class as a whole." (Doc. #26, ¶ 89.)   After stating the counts, plaintiffs have a section entitled "Prayer for Relief" in which they request that the court "[a]ward declaratory and injunctive relief as permitted by law" and award additional relief "including injunctive relief to prohibit Progressive from continuing to utilize WCTL Valuation in Florida." (Id. at pp. 25-26, ¶¶ E, H.)

"[A]nalysis of class certification must begin with the issue of standing" of the class representative.   Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987); Prado-Steiman, 221 F.3d at 1279-80.   At least one of the named plaintiffs must have standing. Griffin, 823 F.2d at 1482; see Kondrat'yev v. City of Pensacola, Fla., 903 F.3d 1169, 1172 (11th Cir. 2018).   As the Eleventh Circuit has summarized:

> Standing requirements apply with no less force in the class action context. Article III requires two related, but distinct, inquiries to determine whether a class representative has standing to represent a class. First, the class representative must "satisfy the individual standing prerequisites" of the case or controversy requirement. Second, the class representative must also be part of the class and possess the same interest and suffer the same injury as the class members. At the pleading stage, the plaintiff must clearly ... allege facts demonstrating each element of standing.
>
> The first inquiry is the familiar three-part standing test that requires a plaintiff to have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The second inquiry focuses on the relation between the

> class representative's injuries and those he alleges on
> behalf of the class. It is well-settled that prior to
> the certification of a class, and technically speaking
> before undertaking any formal typicality or commonality
> review, the district court must determine that at least
> one named class representative has Article III standing
> to raise each class subclaim.

Fox v. Ritz-Carlton Hotel Co., L.L.C., 977 F.3d 1039, 1046 (11th

Cir. 2020) (internal punctuation and citations omitted.); see also

Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1268 (11th Cir. 2019).

"In order to demonstrate that a case or controversy exists to

meet the Article III standing requirement when a plaintiff is

seeking injunctive or declaratory relief, a plaintiff must allege

facts from which it appears there is a substantial likelihood that

he will suffer injury in the future." Malowney v. Fed. Collection

Deposit Group, 193 F.3d 1342, 1346 (11th Cir. 1999).  "Thus, in

order for this Court to have jurisdiction to issue a declaratory

judgment, . . . [the plaintiffs] must assert a reasonable

expectation that the injury they have suffered will continue or

will be repeated in the future." Id. at 1347. That future injury

must be "real," "immediate," and "definite." Mack v. USAA Cas.

Ins. Co., 994 F.3d 1353, 1357 (11th Cir. 2021)(quoting Malowney,

193 F.3d at 1347). Article III standing "must be determined as of

the time that the plaintiff's complaint is filed," Arcia v. Fla.

Sec'y of State, 772 F.3d 1335, 1340 (11th Cir. 2014), and must

continue for the duration of the case.

The Court finds that plaintiffs lack standing to seek injunctive or declaratory relief, and therefore cannot satisfy Rule 23(b)(2). Plaintiffs have not shown facts which could reasonably support a finding that they are likely to be subject to future injury from Progressive's application of the WCTL methodology. Plaintiffs' vehicles were no longer insured by Progressive. (Docs. #98-3, pp. 35-36; #98-4, pp. 73-74.) Even if they were, neither Plaintiff would have standing. "[T]he possibility that [a plaintiff] may someday be in another car accident ... and still be insured by [the insurance company] under the same or a similar policy being interpreted the same way, thereby having this issue present itself again ... is too contingent to constitute a 'substantial likelihood' of future injury." A&M Gerber Chiropractic, LLC v. GEICO Gen. Ins. Co., 925 F.3d 1205, 1215 (11th Cir. 2019). See also Mack, 994 F.3d at 1358 ("Because there is no substantial likelihood that Mack will total his car again while insured by USAA, he lacks standing to sue for a declaratory judgment about the method it uses to assess payments under the policy.").

Progressive is the only insurer who is a party to this lawsuit, and its valuation methodology can have no impact on either Plaintiff. The methodologies that other insurers may use have no bearing on plaintiffs' standing to sue these defendants. There is no real and immediate threat to plaintiffs from these defendants.

The possibility that someday they may be in another motor vehicle accident, resulting in total losses, where Progressive provides a settlement value produced by the WCTL system, is simply too speculative.  See McCullum v. Orlando Regional Healthcare Sys., Inc., 768 F.3d 1135, 1146 (11th Cir. 2014).  See also Malowney, 193 F.3d at 1347; AA Suncoast Chiropractic Clinic, P.A., 938 F.3d at 1177 ("The chance that lightning might strike twice is not enough to justify injunctive relief.").  Additionally, there are no facts shown which would justify certifying a class under Rule 23(b)(2) as to Mitchell International or J.D. Power. The Court therefore denies plaintiffs' Motion to Certify a class under Rule 23(b)(2) due to plaintiffs' lack of standing.[13]

### (2) Rule 23(b)(3) Requirements – Predominance and Superiority

Plaintiffs assert that their claims are maintainable as a class under Rule 23(b)(3). (Doc. #82-24, pp. 25-29.)  Rule 23(b)(3) requires plaintiffs to demonstrate that (1) the questions of law or fact common to all members of the class predominate over questions pertaining to individual members ("predominance"); and

---

[13] Furthermore, the only claim against Progressive is for breach of contract, for which both plaintiffs have claimed damages. The ability to obtain a money judgment for damages should a breach of contract be proven is an adequate remedy at law which negates the ability to obtain injunctive relief.  B.G.H. Ins. Syndicate, Inc. v. Presidential Fire & Cas. Co., 549 So. 2d 197, 198 (Fla. 3d DCA 1989).

(2) that a class action is superior to other available methods of litigation ("superiority"). Fed. R. Civ. P. 23(b)(3); Babineau v. Fed. Ex. Corp., 576 F.3d 1183, 1190 (11th Cir. 2009); Vega, 564 F.3d at 1265.

**(a) Predominance Requirement**

"The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Windsor, 521 U.S. at 591 (internal quotations omitted). For common issues to predominate, plaintiffs must demonstrate that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as whole, . . . predominate over those issues that are subject to individualized proof." Kerr v. City of West Palm Beach, 875 F.2d 1546, 1558 (11th Cir. 1989) (internal quotations and citation omitted). In addition, "predominance also requires that damages resulting from the injury be measurable on a classwide basis through use of a common methodology." Randolph v. J.M. Smucker Co., 303 F.R.D. 679, 696 (S.D. Fla. 2014) (quoting Comcast Corp., 569 U.S. at 29). Although the "[c]alculations need not be exact," the Supreme Court has instructed lower courts to conduct a "rigorous analysis" to determine whether the purported damages model fits the liability case. Id. at 682.

The Eleventh Circuit has described the process for determining predominance as follows:

> To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements. The district court should then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. Common questions are ones where the same evidence will suffice for each member, and individual questions are ones where the evidence will var[y] from member to member.
>
> After identifying the common and individual questions, the district court should determine whether the common questions predominate over the individual ones. We have adopted the following rule of thumb: [I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.... If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate. But predominance requires a qualitative assessment too; it is not "bean counting," and the "relative importance" of the common versus individual questions also matters. District courts should assess predominance with its overarching purpose in mind— namely, ensuring that a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

Brown, 817 F.3d at 1234 (internal citations and punctuation omitted). See also Carriuolo v. Gen. Motors Co., 823 F.3d 977, 985 (11th Cir. 2016).

As the Court sees it, the following are the primary common issues of law or fact raised by the claims in the Complaint: (1) whether the WCTL valuation methodology is statistically invalid; (2) if so, whether Florida Stat. § 626.9743(5) requires a statistically valid evaluation methodology; and (3) if so, the

proper method of calculating damages for (a) persons who received a conditions adjustment to their settlement amount and (b) persons who received a market value adjustment to their total loss settlement amount.  See (Doc. #26, ¶¶ 25-29, 41-44, 82, 84, 86, 92; Doc. #82-24, pp. 25-30.)

Progressive maintains that plaintiffs have provided no evidence that its methodology is statistically invalid or statutorily impermissible.  Progressive argues that determining whether it undervalued all of the Florida total loss vehicles since 2013 would require individual mini-trials due to the unique evidence for each claim, thereby precluding satisfaction of the predominance requirement.  (Doc. #106, pp. 20-22.)  Progressive further asserts there is no common evidence plaintiffs could use to prove that "any particular [insured] was cheated on any particular occasion, or by how much." (Id. at 21, citing Klay v. Humana, Inc., 382 F.3d 1241, 1266 (11th Cir. 2004)).

The WCTL Defendants contend that "statistical validity" is not a term that is defined or referenced in plaintiffs' insurance contracts with Progressive or in the Florida Total Loss Statute. (Doc. #99, p. 21.)  They argue that plaintiffs' entire theory of the case is based on the assumption that there is one single correct answer to the question, "what is the value of a vehicle at the time of an accident." (Id., pp. 22-23.)  The WCTL Defendants emphasize that plaintiffs' theory glosses over the fact that the

Florida Total Loss Statute provides several methodologies to compute the value of a total loss vehicle, which are almost certain to reach different conclusions. (Id., p. 22.) Defendants contend there is no evidentiary support for the theory that there is a single "statistically valid" method of valuing a vehicle, or that damages could be calculated by the difference between the value determined by the WCTL system and a theoretically "statistically valid" method. (Id., p. 23.)

   As noted above, whether the WCTL valuation methodology is statistically invalid is a question of fact which is common to the claims of all class members.  Plaintiffs' reliance on statistical invalidity as a theory of liability, however, is problematic at the class certification stage.  Nowhere in the Florida Total Loss Statute is there a requirement that the four methodologies for determining the actual cash value for a total loss vehicle be "statistically valid."  See § 626.9743(5). Nor have plaintiffs established that their insurance contracts with Progressive defined, referenced, or required statistical validity. See (Doc. #82-6.)  Indeed, Progressive's insurance policy states it may use estimating, appraisal or injury evaluation systems to assist in adjusting claims and determining the amount of damages, or loss payment under the policy, but there is no requirement that the WCTL system must be statistically valid. (Doc. #87-9, p. 40.).

Thus, even assuming the WCTL system is not statistically valid[14], there is no requirement that it must be statistically valid in order to comply with the Florida statute.

While plaintiffs assert that the NADA Guidebook is a proper source for valuing the vehicles, there has been no showing that other guidebooks such as NADA or Kelly blue book are statistically valid, nor that there is a requirement that Progressive must pay the NADA value for total loss claims.  See Curtis v. Progressive N. Ins. Co., No. CIV-17-1076-PRW, 2020 U.S. Dist. LEXIS 83429, at *7 (W.D. Okla. May 12, 2020)(finding that NADA values were insufficient to support plaintiffs' contention that the use of the WCTL system categorically violated Oklahoma law. The court also determined that because Oklahoma did not require the use of the NADA Guidebook, plaintiff could not presume damages could be calculated by subtracting the WCTL payments from NADA values).

---

[14] The only evidence plaintiffs provide in support of their argument that the WCTL system is statistically invalid is an August 2015 affidavit by Dr. Norma Hubele (Doc. #87-62) which was executed for use in an unrelated case. (Id., p. 2.)  Defendants Mitchell and J.D. Power argue in their Motion to Exclude the Hubele Affidavit (Doc. #89) that even if the affidavit was admissible, it does not reach a substantive opinion about the statistical validity of the WCTL system because Dr. Hubele stated she needed "additional information . . . to complete [her] analysis and evaluation of the WCTL system." (Doc. #87-62, ¶ 14.)  Upon review, the Court finds that assuming its admissibility, the affidavit is of minimal usefulness since Dr. Hubele clearly stated she did not have sufficient information to reach such a conclusion.

Plaintiffs contend that the methodology of computing the negative condition adjustment is statistically invalid, and therefore all the downward condition deductions should be disregarded in valuing total loss vehicles. (Doc. #26, ¶¶ 31, 43-45; Doc. #103, p. 3.) Plaintiffs seek damages in the form of "reimbursement on a dollar-for-dollar basis for each of the statistically invalid negative condition adjustments that reduced the market value . . . ." (Doc. #104, p. 10.)

Plaintiffs' position that no condition adjustment should be made in determining the actual cash value for each total loss vehicle does not comport with how the actual cash value of a vehicle is determined in Florida. The actual cash value of a vehicle is "generally defined as 'fair market value' or 'replacement cost minus normal depreciation'" with depreciation being defined as "a decline in an assets value because of use, wear, obsolescence, or age." Trinidad, 121 So. 3d at 438 (quoting Black's Law Dictionary 506, 1690 (9th ed. 2009)); see, e.g., Sunflower Condo. Ass'n v. Everest Nat'l Ins. Co., No. 19-CV-80743-RUIZ/REINHART, 2020 U.S. Dist. LEXIS 213157, at *2 n.1 (S.D. Fla. Nov. 10, 2020) ("Actual Cash Value" means "'market value' or 'fair market value'," and accounts for the property's depreciated condition[.]"); Goff v. State Farm Fla. Ins. Co., 999 So. 2d 684, 689 (Fla. 2d DCA 2008); Am. Reliance Ins. Co. v. Perez, 689 So. 2d 290, 291 (Fla. 3d DCA 1997).

In addition, Progressive's insurance policy states that "[t]he actual cash value is determined by the market value, age, and condition." (Doc. #87-9, p. 35.) Thus, even if the WTCL system's negative condition adjustment is statistically flawed, it does not obviate the need to determine the condition of the vehicle to properly calculate the actual cash value.[15]   See Slade v. Progressive Sec. Ins. Co., 856 F.3d 408, 411 (5th Cir. 2017) (plaintiffs only challenged the WCTL system's base value calculation and agreed to use the WCTL's current system for condition adjustment in calculating the value of the total loss vehicles). Plaintiffs have not proposed a common method of determining the proper value for negative condition adjustments. Accordingly, the Court agrees with Progressive and the WCTL Defendants that statistically invalid condition adjustments do not indicate that class members would be entitled to a refund of the full negative condition adjustment, and that resolution of the issues concerning negative condition adjustments would "break down into an unmanageable variety of individual legal and factual issues[,]" which does not satisfy the predominance standard. Babineau, 576 F.3d at 1191.

_____

[15] The record evidence shows that the NADA retail value purports to provide "clean" retail values that do not account for condition (except mileage). (Doc. #110-2, ¶¶ 23-27.)

Defendants argue the Market Value subclass is no more tenable than the Condition Adjustment subclass. In particular, defendants contend that the NADA Guidebook values in Progressive's possession are not "valid" proxies for pre-loss values of total loss vehicles, and that even if the WCTL is somehow invalid, there is no contractual or statutory basis to force Progressive to retroactively value vehicles using the NADA Guidebook. (Doc. #98 pp. 29-32; Doc. #99, pp. 21-22.) Progressive argues that because plaintiffs seek to recover the difference between condition-adjusted WCTL market values and unadjusted NADA values, any Market Value subclass member who also falls in the Condition Adjustment subclass would recover the full value of the condition adjustment *twice*. (Doc. #98, p. 30.)

According to plaintiffs, the market value subclass also presents the common issue of statistical validity that will not require individualized inquires. Plaintiffs argue that resolution of the damages for the market value subclass is "simple" in that Progressive would be required to use a "validly—recognized valuation product" like the NADA Guidebook, and take the difference between the NADA and WCTL values to measure the damages for the market value subclass. (Doc. #103, pp. 2-3.)

As with the condition subclass, plaintiffs have not demonstrated that proving the market values derived by the WCTL system are statistically flawed would establish the market values

of the total loss vehicles violated the Florida Total Loss Statute
or class members' insurance contracts.   A determination of the
truth or falsity that the WCTL system is statistically flawed will
not necessarily prove that the putative class members were
underpaid in contravention of Florida law.   Rather, to reach this
determination would require individualized inquiries into the
vehicles make, model, mileage, options, condition of the total
loss vehicle, and price of comparable vehicles.   Therefore, "while
use of the WCTL system may theoretically violate [Florida] law or
an insurance provision in some instances, this determination can
only be made after an extremely fact-specific inquiry into a total
loss claim." Curtis, 2020 U.S. Dist. LEXIS 83429, at *7.

   Likewise, as emphasized by defendants, if plaintiffs were
successful in showing that the class members were underpaid for
their total loss vehicles, there is the potential that any Market
Value subclass member who also falls in the Condition Adjustment
subclass would recover the full value of the condition adjustment
twice. (Doc. #98, p. 30.) This is so because the Market Value
accounts for condition adjustments.   Plaintiffs have not addressed
how damages could be properly calculated for the two subclasses to
avoid double recovery.

   In sum, Plaintiffs have failed to satisfy the predominance
requirement at this juncture because they are unable to demonstrate
that the alleged injury in this case "capable of proof at trial

through evidence that [was] common to the class rather than individual to its members," and that damages be "measurable on a class-wide basis through use of a common methodology." <u>Comcast Corp.</u>, 569 U.S. at 30 (citations omitted).  Therefore, plaintiffs have failed to meet the predominance requirement of Rule 23(b)(3).

**(b) Superiority**

Because predominance is not satisfied, the class action will not constitute a superior method of adjudication.  <u>Klay</u>, 382 F.3d at 1269 ("Superiority analysis is intertwined with predominance analysis; when there are no predominant common issues of law or fact, class treatment would be either singularly inefficient . . . or unjust.") (quotation marks omitted); <u>see also</u> <u>Hutton v. Norwegian Cruise Line Ltd.</u>, No. 99-2383-CIV, 2000 U.S. Dist. LEXIS 23724, at *8 (S.D. Fla. Dec. 21, 2000) (holding that because predominance was not satisfied, there would not be a mechanism superior to individual adjudications).

**(3)  Rule 23(c)(4) Requirements**

In the alternative, plaintiffs propose class certification pursuant to Rule 23(c)(4), and asks that the Court certify the issues of whether defendants' use of the statistically invalid WCTL system constitutes a breach of Progressive's policy obligations and a violation of the requirements of the Florida Total Loss Statute.  (Doc. #82-24, p. 30.)

Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). However, courts "have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement." City of St. Petersburg v. Total Containment, Inc., 265 F.R.D. 630 (S.D. Fla. 2010) (quoting O'Neill v. The Home Depot U.S.A., Inc., 243 F.R.D. 469, 481 (S.D. Fla. 2006)); see also Teggerdine v. Speedway, LLC, No. 8:16-cv-03280-T-27TGW, 2018 U.S. Dist. LEXIS 91043, at *16 (M.D. Fla. May 31, 2018) (finding that because "[p]laintiff has not satisfied the predominance requirement of Rule 23(b)(3) . . . therefore Rule 23(c)(4) is not available to her."). As the Court finds that predominance has not been demonstrated, certification of an issue class is also inappropriate.

### (4)  Appraisal of Disputed Total Lass Valuations

Progressive argues that certifying any class in this case would improperly deny Progressive its bargained-for right to seek appraisal of disputed valuations under plaintiffs' insurance policies. Plaintiffs respond that Progressive has waived its right to invoke appraisal as Progressive never asserted or reserved this right until class certification, and that appraisal is not appropriate in this case because it involves questions about legal and statutory interpretation. See Lopez v. Progressive Select Ins.

Co., No. 18-61844-CIV, 2019 U.S. Dist. LEXIS 43935 (S.D. Fla. Mar. 15, 2019).  The Court agrees.  In Lopez, the court considered similar arguments and concluded that the defendant had arguably waived its right to seek appraisal under the terms of the insurance contract as defendant had received the plaintiff's complaint, and waited until three months after filing a motion to dismiss the complaint, and engaging in a discovery conference and submitting a scheduling report before invoking the appraisal process.  Id. at *25-26.

Likewise, here, Progressive was served with plaintiffs' Complaint on October 26, 2018, Progressive filed a Motion to Dismiss on December 19, 2018, answered the Complaint on June 12, 2019, and has conducted discovery.  Yet, not until Progressive opposed class certification on February 7, 2020, did it raise any issue concerning its right to demand appraisals.  Progressive has waived its right to invoke appraisal at this stage of the litigation. Lopez, 2019 U.S. Dist. LEXIS 43935, at *25-26.

Accordingly, it is now

**ORDERED**:

1. Plaintiffs' Motion to Certify Class (Doc. #82-24) is **DENIED**.

2. Defendants Mitchell International, Inc. and J.D. Power & Associates Motion To Exclude Hubele Affidavit from Consideration (Doc. #89) is **DENIED** as moot.

    **DONE AND ORDERED** at Fort Myers, Florida, this <u>  18th  </u> day of

January, 2022.



_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Counsel of record